IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DANIEL K. THOMAS, #243760, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>DR. RAHMING, et al., )<br>)<br>Defendants. ) | CIVIL ACTION NO. 2:15-CV-470-MHT<br>[WO] |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

This cause of action is pending before the court on a 42 U.S.C. § 1983 complaint filed by Daniel K. Thomas ("Thomas"), an indigent state inmate presently incarcerated at the Kilby Correctional Facility ("Kilby"). In the complaint, Thomas alleges that since June of 2014 the defendants have denied him adequate medical treatment for an intermittent elevated pulse rate. Upon initiation of this action, Thomas filed a motion for preliminary injunction in which he seeks injunctive relief requiring that the defendants conduct additional diagnostic tests to determine the cause of his high pulse rate. *Doc. No. 3*.

On July 8, 2015, the court entered an order directing the defendants to show cause why Thomas' motion for preliminary injunction should not be granted. *Doc. No. 7*. The defendants filed a response to this order, supported by relevant evidentiary materials including affidavits and certified copies of Thomas' medical records, in which they argue

that Thomas is not entitled to issuance of a preliminary injunction as he has received appropriate treatment for his pulse rate.

Upon review of the motion for preliminary injunction and the response filed by the defendants, the court concludes that the plaintiff's motion for preliminary injunction is due to be denied.

## II.  STANDARD OF REVIEW

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court...." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  This court may grant a preliminary injunction only if Thomas demonstrates each of the following prerequisites:  (1) a  substantial likelihood of success on the merits; (2) a substantial threat irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the potential damage the requested injunction may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest.  *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983).  "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to the four requisites." *McDonald's*, 147 F.3d at 1306; *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518

F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion).  The moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's claim, regardless of the party's ability to establish any of the other elements. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994); *see also Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"). "'The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.' *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11th Cir.1990)." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

### III.  DISCUSSION

In their response to the motion for preliminary injunction, the defendants deny that they have acted with deliberate indifference to Thomas' medical needs. *Attachment 4 to the Defendants' Response - Doc. No. 21-4*.  Specifically, the defendants maintain that Thomas received necessary and appropriate treatment for his elevated pulse rate.  In addressing Thomas' claim, the defendants maintain that Thomas is routinely evaluated and examined by medical personnel with respect to complaints of a high pulse rate, has undergone diagnostic procedures in an effort to assist medical personnel in providing proper medical treatment for his condition and has been prescribed medication.  Dr. Wilcotte Rahming, the

medical director at Kilby, provides the following information with respect to the treatment Thomas has received:

> An individual's pulse rate or heart rate is typically measured during routine physical examinations. Pulse rate or heart rate only indicate an individual's level of cardiac fitness, [and] should not be confused or accepted as a substitute for blood pressure. . . . The pulse rate simply indicates the rate at which the heart is pumping blood through a patient's circulatory system and the rate at which a patient is consuming oxygen. In order to be clinically abnormal, a patient's heart rate must be either below 60 or above 100.
> Mr. Thomas arrived at Kilby . . . on March 11, 2014. An EKG (which simply monitors the functionality and flow of electricity within the heart) conducted on April 9, 2014, revealed a normal result.
> Throughout his incarceration, Mr. Thomas underwent annual physical examinations, which included monitoring of his pulse rate. . . . Mr. Thomas displayed a pulse rate of 80 during his annual physical exam on May 30, 2014. Mr. Thomas last underwent an annual exam on May 14, 2015, at which time he demonstrated a normal pulse rate of 76.
> In June, 2014, Mr. Thomas reported instances of an elevated pulse rate while he was being held in administrative segregation due to his threats to commit suicide. Mr. Thomas submitted a sick call request form on June 29, 2014, complaining of an elevated pulse rate and requesting medical attention. The nurse practitioner saw Mr. Thomas on July 1, 2014 regarding his complaints of a change in his pulse rate. At that time, Mr. Thomas' recorded blood pressure was within normal limits and his pulse rate was only slightly elevated. Mr. Thomas was seen again for the same complaints on July 7, 2014, with no material change in his condition.
> In response to his continuing concerns, the medical staff at Kilby ordered Mr. Thomas to have his pulse rate measured two times per day for each day of the week beginning in July of 2014. However, two EKGs conducted on Mr. Thomas in July, 2014, were normal.
> In orders dated August 28, 2014, Mr. Thomas received a prescription for Zoloft which is intended to treat the signs and symptoms of anxiety, which Mr. Thomas has displayed as being on edge, easily agitated and hyper-focused on minor, non-substantive issues related to his care. On August 29, 2014, Mr. Thomas submitted a sick call request form requesting to see the "the chronic care doctor" as soon as possible for evaluation of chest pains and "***decreased*** pulse rate." As a follow-up to this appointment, I saw Mr. Thomas on

September 8, 2014.  Again, during this visit, Mr. Thomas displayed normal heart rate and pulse rate.  As with part of evaluations, I concluded that Mr. Thomas' condition was likely the result of some form of anxiety, however I instructed Mr. Thomas that we would continue to monitor his condition and to notify the medical staff if his heart ever expressed another incident of significant racing or an elevated pulse rate.  An EKG dated September 9, 2014, obtained with respect [to] Mr. Thomas' cardiac condition stated, "Abnormal EKG."  Because of this abnormal reading, I requested a second EKG, which was "Normal."  EKG equipment interpretations typically err on the side of caution.  The machine[] tries to fit any rhythm into a pattern it can read without considering variables like existing treatments, medications (which can speed up or slow down the heart rate), where the nurse puts the leads, etc.  Anything other than a normal sinus rhythm is marked abnormal.  Stated differently, it could be said that an EKG errs on the side of finding an abnormality unless the patient's heart rhythm matches the model for a normal sinus rhythm.  Thus, in a clinical setting, a clinical treatment decision is not usually made based upon one abnormal EKG, but *at least* two consecutive abnormal EKGs, which Mr. Thomas never had.  The second EKG will usually demonstrate the false-positive nature of the first EKG.

Between July 1 and September 18, 2014, the nursing staff evaluated Mr. Thomas on three (3) other occasions for his complaints of a "racing" heart rate.  As of July 1, 2014, Mr. Thomas displayed a heart rate of 95.  Mr. Thomas was evaluated during sick call on September 5, 2014, for complaints of chest pain and a decreased heart rate.  At that time, he reported a blood pressure reading of 122/78 and a pulse rate of 64, i.e. well within acceptable limits.  So. Mr. Thomas was referred for further evaluation by the nurse practitioner.  That same day, the nurse practitioner at Kilby saw Mr. Thomas, who requested that he be placed on a beta blocker which was previously provided by another physician at another facility.  However, as of the date of this visit with Mr. Thomas, he displayed a blood pressure of 122/78 (well within normal limits) and a pulse rate of only 64, i.e. clearly within the normal range of 60-100 beats per minute.  When the medical staff evaluated Mr. Thomas on September 20, 2014, he denied any chest pain or shortness of breath or any acute distress of any other kind, only stating that his heart was racing.

When the medical staff evaluated Mr. Thomas during sick call on September 24, 2014, he displayed an elevated pulse in the rate of 122 to 160, which is high.  Following this appointment, Ms. Lockhart consulted with me and it was decided that we would prescribe him medication to address his racing heart rate and also ordered [a] heart echo to more thoroughly investigate

the cause of his condition. However, at that time, the site physician did not see any specific data indicating that Mr. Thomas's life was endangered or that he required any different or more comprehensive form of care.

Likewise, on September 28, 2014, the medical staff noted that Mr. Thomas was not experiencing any chest pain or shortness of breath and that he had a normal blood pressure reading. Mr. Thomas underwent an EKG on September 28, 2014, and I was notified of the results of the EKG which were normal. Mr. Thomas' sick call request form dated October 13, 2014, claimed he was "having problems [with] his heart racte and having pain in his [chest] periodically."

The ADOC security staff transported Mr. Thomas to an off-site facility on October 21, 2014, at which time he received a heart echo. On October 21, 2014, the Kilby medical staff submitted a written request to the off-site provider for a copy of Mr. Thomas's heart echo study. In short, the heart echo study did not reveal any cardiac dysfunction, abnormality or other underlying cardiac issues which required further investigation, evaluation or treatment.

Mr. Thomas requested the results of a recent EKG on October 23, 2014. . . . When Mr. Thomas met with the nurse practitioner on October 24, 2014, he received another examination intended to monitor his overall condition, as well as his cardiac function.

I wrote a prescription for Mr. Thomas on April 1, 2015, for the hypertension medication named atenolol, which is commonly utilized to treat minor cases of elevated blood pressure. When a member of the nursing staff evaluated Mr. Thomas on May 14, 2015, he did not report any pain or discomfort and his respirations were "even and unlabored." I wrote this prescription to see it if played a major role in making Mr. Thomas more comfortable. It did not and [Mr. Thomas] did not show any clinical changes in his overall vital signs.

An EKG conducted on Mr. Thomas on May 20, 2015, was normal. The medical staff evaluated Mr. Thomas for complaints of chest pain on May 22, 2015; however, the exam revealed a normal blood pressure and heart rate of only 64 beats per minute.

Mr. Thomas submitted a sick call request form dated May 27, 2015, reporting continuing chest pain, acknowledging his receipt of medication for his complaints of chest[] pain and requesting "further testing . . . to see if it can be cured." . . . The next day Mr. Thomas submitted another sick call request form in which he wrote, "Follow-up for chest pain."

The nurse practitioner at Kilby evaluated Mr. Thomas on May 29, 2015, for complaints of chest pain. Mr. Thomas told the nurse practitioner that he

had previously demonstrated two "abnormal" EKGs. Again, the nurse practitioner found no objective evidence to substantiate Mr. Thomas's complaints.

The nurse practitioner at Kilby saw Mr. Thomas for complaints of an alleged elevated blood pressure causing him headaches and ringing in his ears. The nurse practitioner noted that Mr. Thomas mentioned some other vague complaints, but also being "rechecked" for a racing heart rate the cause of which was not apparent upon physical examination. The nurse practitioner recommended that Mr. Thomas avoid becoming anxious, but did not find any objective evidence of any specific medical condition causing his reported symptoms.

Mr. Thomas submitted a sick call request form dated June 13, 2015, complaining of chest pain and "trouble breathing." Upon receipt of this sick call request, the medical staff immediately evaluated Mr. Thomas and, despite an initial elevated blood pressure reading, found his blood pressure only slightly elevated and his pulse rate within normal limits after some period of monitoring. An EKG conducted on Mr. Thomas on June 13, 2015, indicated a "normal EKG."

In a sick call request form dated June 26, 2015, Mr. Thomas complained of chest pain, dizziness and ***the dropping of his pulse***. The medical staff did not receive the sick call request form until the following day and immediately summoned Mr. Thomas for evaluation at which time he only reported nearly falling and catching himself. The Kilby medical staff did not ignore any of Mr. Thomas' other medical complaints, concerns or requests for evaluation. As indicated in Mr. Thomas' medication administration records, he received various different medications intended to control his racing heartbeat. In addition to all of the medical . . . attention Mr. Thomas received for his complaints of high blood pressure, an elevated heart rate, high cholesterol and headaches, Mr. Thomas also attended chronic care clinics on a quarterly basis during which the medical staff[] monitored his Hepatitis C condition. . . . Despite trying to communicate with Mr. Thomas related to his medical condition, he has routinely responded in a belligerent fashion to every attempt by the medical staff to discuss his complaints.

Mr. Thomas's medical condition can be summarized as follows: He does not have any underlying cardiac condition or treatable elevated pulse rate. In fact, most of the time, his pulse rate is well within normal limits. He is anxious. He is uptight. His frenetic attitude causes his heart to race. To the extent Mr. Thomas wishes to receive mental health treatment, it is available to him at Kilby, though it is provided by the mental health staff, not the medical

staff.

*Attachment 4 to the Defendants' Response - Doc. No. 21-4* at 2-8 (citations to medical records omitted) (emphasis in original).

Turning to the first prerequisite for issuance of preliminary injunctive relief, the court finds that Thomas has failed to demonstrate a substantial likelihood of success on the merits of his claim. Thomas likewise fails to establish a substantial threat that he will suffer the requisite irreparable injury absent issuance of the requested preliminary injunction. The third factor, balancing potential harm to the parties, weighs much more heavily in favor of the defendants as issuance of the injunction would have an unduly adverse affect on the ability of prison medical personnel to exercise their professional judgment in determining the appropriate course of treatment for inmates. Finally, the public interest element of the equation is, at best, a neutral factor at this juncture. Thus, Thomas has failed to meet his burden of demonstrating the existence of each prerequisite necessary to warrant issuance of preliminary injunctive relief.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for preliminary injunction filed by the plaintiff be DENIED.

2. This case be referred back to the undersigned for additional proceedings.

It is further

ORDERED that **on or before August 17, 2015**, the parties may file objections to the

Recommendation. Any objection must specifically identify the findings in the Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are further advised that this Recommendation is not a final order of the court and, therefore, it is not appealable. Failure to file written objections to the proposed findings in the Recommendation shall bar the party from a de novo determination by the District Court of issues addressed in the Recommendation and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all decisions of the former Fifth Circuit issued prior to September 30, 1981.

    Done this 3rd day of August, 2015.

                                           /s/Charles S. Coody
                                           CHARLES S. COODY
                                           UNITED STATES MAGISTRATE JUDGE